## Case No. 10,773.

### PARROTT v. BARNEY et al.

[1 Sawy. 423;[1] 2 Abb. U. S. 197.]

Circuit Court, D. California. Jan. 25, 1871.[2]

TENANTS' LIABILITY FOR WASTE — PUBLIC POLICY — COVENANT, WAIVER, ETC. — WASTE IN APARTMENTS — ACCIDENTS — DAMAGES TO ADJOINING PREMISES — CARRIER NOT ENTITLED TO KNOW CONTENTS OF PACKAGES — PERFORMANCE OF LEGAL DUTY MAY BE ASSUMED.

1. In the absence of some agreement to the contrary, the tenant is responsible for all waste, however, or by whomsoever committed, except it be occasioned by act of God, the public enemy, or the act of the reversioner himself.

[Cited in Powell v. Dayton, S. & G. R. Co., 16 Or. 33, 16 Pac. 868.]

2. The liability of tenants for waste does not depend on negligence, but is imposed on grounds of public policy.

3. A covenant in a lease to surrender the premises at the expiration of the term in as good condition as the reasonable wear thereof will permit, damages by the elements excepted, does not protect the tenant from liability for waste, resulting from accidents occurring without his fault.

4. A covenant in a lease requiring the tenant to occupy the premises for a specific purpose, as an express office, does not impose on the landlord, and exempt the tenant from, all the risks incident to such business. not resulting from the wrongful acts or negligence of the tenant.

5. Waste may be committed by a tenant of a portion of a building.

6. Defendants are expressmen carrying packages between New York and California. A wooden case containing nitro-glycerine was delivered to defendants at New York, to be carried

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[2] [Affirmed in 15 Wall. (82 U. S.) 524.]

to Los Angeles, California, in the ordinary mode, and in the ordinary course of business. No questions were asked, and no information given, as to its contents. On arriving at San Francisco, a liquid resembling oil appeared to be leaking from the case, and it was taken to the office of defendants, the premises leased from plaintiff, for examination. While under examination it exploded, injuring the premises occupied by defendants, and other premises of the plaintiff leased to, and occupied by, other parties. Defendants had no knowledge of, and no reason to suspect, the dangerous character of the contents, and there was, under the circumstances, no negligence on their part. *Held,* that defendants were not liable for the damage resulting from the accident to plaintiff's premises, occupied by other parties adjoining the premises held and occupied by defendants, but were liable for waste resulting to the premises occupied by themselves.

7. A common carrier is not, under all circumstances, entitled to know the contents of packages tendered for carriage, and a mere failure to ascertain whether the package contains anything dangerous, there being no reasonable ground for suspicion, does not, of itself, constitute negligence.

[Cited in Hale v. Milwaukee Dock Co., 29 Wis. 489.]

8. In the exercise of his lawful rights, every man has a right to act upon the hypothesis that every other person will perform his duty, and obey the law; and in the absence of any reasonable ground to think otherwise, it is not negligence, to assume that he is not exposed to a danger, which can only come to him from a violation of law on the part of some other person.

The complaint contains four counts. The first is for technical waste by the landlord against his tenant from year to year, based on the statute. The waste is charged to have resulted from negligently introducing an explosive substance [namely, nitro-glycerine upon the premises].[3] etc. Treble damages are claimed. The second is in the nature of a count in case at common law, by the landlord against a stranger, for injury to his reversionary interest in the premises demised to his tenants, Bell and the Union Club. The injury is alleged to have resulted from negligently introducing, etc., the explosive substance. The third, is by the landlord against his tenant, for waste to the demised premises, and also, for injuries resulting from the same acts to the reversion in the other premises, demised to other tenants. It is in the nature of a count in case at common law. The injury is alleged to have resulted from negligence. The fourth, for waste committed on the premises demised to defendants [D. N. Barney and others], and for injuries committed by defendants vi et armis, to the premises demised by plaintiff [John Parrott], to Bell, and the Union Club. The answer takes issue on all the material allegations; also sets up a lease under which defendants occupied, and a right to carry on the business of expressmen in the demised premises; and also avers a repair of the demised premises, before suit brought, to plaintiff's satisfaction, and with his approbation.

[3] [From 2 Abb. U. S. 197.]

The cause was tried by the court without a jury, the parties having waived a jury, in pursuance of the statute. The court found the facts to be as follows:

The defendants constitute the well-known express company doing business under the name of Wells, Fargo & Co. The plaintiff had for many years prior to the commission of the grievances complained of, been, and he then was, seized in fee of the premises in question. On the seventh day of November, 1855, said plaintiff leased to defendants for a period of two years from the first day of January, 1855, a portion of said premises described in the lease as "The basement and first floors contained in that certain granite building, situate in the city of San Francisco, on the northwest corner of California and Montgomery streets, together with all vaults and permanent banking fixtures therein contained; together with the use of a brick warehouse in the rear, thirty by sixty feet, and the right of way and for passage thereto through the back yard of said premises, and all appurtenances thereunto belonging." Said lease contained the following covenants on the part of defendants, viz.: "It is likewise agreed that the said parties of the second part shall not receive in said demised premises, either for their own account or on storage, or allow any person to place therein, gunpowder, alcohol, or any other articles dangerous from their combustibility; that they will, during the term of this lease, occupy the premises solely for the business of their calling, to wit, banking and express office, and that they are not to underlet the same to any other person or persons, for any other business in part or the whole, without the prior consent in writing of the party of the first part." The defendants, also, covenant, "At the expiration of the said term to quit and surrender the said demised premises, with all fixtures therein contained, in as good condition as the reasonable use and wear thereof will permit, damages by the elements excepted." The rent was twelve thousand dollars per annum, payable in monthly installments of one thousand dollars each in advance. The lease was afterwards renewed on the same terms, for two years, from January 1st, 1858, and again for a term of two years, from January 1st, 1860. After the expiration of the latter term, the premises were held over from year to year, without any further special agreement, until the sixteenth day of April, 1866, the time of the commission of the alleged grievance, the defendants all the time paying rent to the plaintiff, in accordance with the terms of said lease. Before, and at the last-mentioned time, one Garrett W. Bell, as tenant from year to year of said plaintiff, occupied a portion of the buildings described in the complaint, to wit: "The first, or lower floor of said iron building, and of that of the said brick building, situate to the northwest thereof, and called a furnace;" also, a certain

corporation, called "The Union Club of San Francisco," as tenant of plaintiff, upon terms hereinafter stated, was in the possession and occupation of the remaining portions of the said premises, being the whole above the first, or lower floor of all the said buildings and premises. The immediate reversion of the whole of said premises, as well those demised to the defendants as those occupied by said Bell and the Union Club, remaining all the time in said plaintiff. The portion of the premises occupied by said defendants had been used for their banking and express business, as provided in the said lease, from the commencement of the term down to, and including, the sixteenth day of April, 1866. The defendants, during all that time, were carrying on the business of public express carriers throughout various parts of the United States, the states and territories of the Pacific Coast, and between the United States and Europe; also, between New York and San Francisco, by the way of the Isthmus of Panama, using on the latter route the steamships of the Pacific Mail Steamship Company's lines, running between New York and Aspinwall, and Panama and San Francisco, to convey their express matter, transporting the same across the Isthmus by the Panama Railroad. The said steamers at that time left New York three times each month—on the first, eleventh and twenty-first days of the month. It was a regulation established by defendants, that no express freight should be received at the wharf in New York on days appointed for the steamers to leave New York for Aspinwall. The said steamers sailed from pier No. 42, North river. On the afternoon of the last regular day for the steamer to leave New York for Aspinwall, prior to March 14, 1866, and after the steamer had left, a man brought to pier No. 42, North river, from which said steamers take their departure, a case in a wagon, and asked Patrick O'Leary, who was an employee of the defendants, to receive it. O'Leary was the defendants' freight measurer on pier No. 42. O'Leary informed him that they did not receive freight on the day of the steamer's sailing. The man said it would be hard to require him to take it back, as he had brought it a great way, from Harlem, some seven miles distant. O'Leary told him, that, since he had brought it so far, he could leave it there at his own risk, but that he could not give a receipt for it on that day; that the party must come the next day and get a receipt. The party then carried in the case and placed it opposite the freight office on the dock. O'Leary then noticed that the case had not been marked or weighed, or strapped, as required by defendants' regulations, and called the party's attention to these facts; whereupon he requested O'Leary to weigh, mark and strap the same, saying that he would pay for it. O'Leary then, in pursuance of the party's directions, marked upon the box

the address, "W. H. Mills, Los Angeles, Cal. Fast." He also procured some wooden straps, or hoops, some nails and an adze, and strapped the case, driving the nails through the hoops, or straps, into the case, as required by defendants' regulations. The case then lay there ten days, till the next steamer left. Two days after the case had been thus left, the party who brought it came down and applied to O'Leary for a receipt, and O'Leary told Mr. Middlebrook to give a receipt for the case, and Mr. Middlebrook, who was the tally clerk at the time, and the proper party to give the receipt, did so in the presence of O'Leary. At the time the case was presented, it was clean and appeared to be in perfect condition. There was nothing suspicious about its appearance. The only thing wanting to make it conform to the regulations of the defendants was, it required strapping, weighing and marking, and when strapped, weighed and marked by O'Leary, it appeared to be in all respects in proper condition for shipment. The case was an ordinary wooden box used for shipping goods in, apparently some two and a half feet square by three feet long. It measured fourteen feet eleven inches cubic measure, and weighed three hundred and twenty-nine pounds. The usual course of business in receiving such freight is, that O'Leary received and marked it, Middlebrook gave a receipt for it, and it then remained on the wharf with other freight, without any one taking other special notice of it, till it was carried on board ship and stowed by the stevedores; and this case took the usual course. The party receiving the receipt subsequently presents it at the office to the express receipt clerk, who takes it up, and from it makes out the ordinary express receipt, and delivers it to the shipper. In this instance, the receipt thus given by Middlebrook was surrendered, and the usual express receipt given. The receipt given by the tally clerk (such as that given by Middlebrook in this instance) on the delivery of the freight, is the original from which the express receipts, bills of lading, manifest, and all others are made up. The clerk making out the express receipt for the shipper, or the bill of lading, as the case may be, is governed by this original, and he does not see or inspect the freight itself. After express matter is thus delivered, and the said original receipt is given to the party delivering it, it goes into the general mass of freight of that kind, and there remains till taken on board the steamer. Neither at the time of the delivery of the case in question, nor of the taking of said receipt, was there anything said about the contents of this box, either between O'Leary and the party bringing it, or between the latter and O'Leary and Middlebrook, nor at any other time; nor, so far as appears by the evidence, at any time to the defendants, or any of their employees, and neither of said employees or defendants had

any idea or suspicion that it contained anything dangerous. No questions were asked as to its contents, and no information given. The said case was shipped with a large quantity of other express freight, on the steamer that left New York for California on the twenty-first of March, 1866. At that time the defendants sometimes carried to California as many as six thousand packages, put up in cases of a similar character and appearance, per steamer, in addition to a large number shipped for Panama, South America, Mexico, and other places, and a fair average of such packages of merchandise, shipped to California by each steamer, was from four to five thousand. The steamer from Panama, connecting with the steamer which left New York on the twenty-first of March, arrived in San Francisco in due time, on the thirteenth or fourteenth of April, having the said case on board. On the afternoon of the fourteenth, the said case was taken from the vessel and placed upon the wharf, and was found to be leaking. The leakage had evidently commenced since the steamer left Panama, and the substance leaking from the case had the general appearance of sweet or salad oil. Said case was left on the wharf till the morning of the sixteenth day of April, when, in pursuance of the regular and ordinary course of defendants' business, where express freight is found to be damaged, it, together with another case of somewhat similar appearance, containing silverware, which had been stained by the substance leaking from the case in question, and appeared to be in a damaged condition, was sent by a dray to the defendants' office, the premises so occupied by defendants as aforesaid, for examination, and the steamship company notified to send an agent to be present and examine the package in conjunction with an agent of defendants, for the purpose of ascertaining the nature and extent of the damage, and of determining, if possible, whether the responsibility for the damage rested upon the steamship company. The two packages were taken to the said premises by defendants' servants, and deposited on said premises in the open court or yard. in the rear of the express office, and between it and the premises occupied by Bell, which was the usual place of examination of such packages when found to be damaged. About one o'clock p. m., Mr. Havens, as the representative of the Pacific Mail Steamship Company, and Mr. Webster, of the defendants, in company with another of defendants' employees, and in the presence of Mr. Knight, the second person in authority in the management of defendants' business on the Pacific coast, with a mallet and chisel proceeded to open the case for examination, and while engaged in opening the said case with the mallet and chisel, the substance contained in it exploded, instantly killing all the said parties and one or two others, besides destroying and greatly injuring the premises in the manner described in the complaint. The plan and mode of opening and examining the case in question, was the same usually adopted in the ordinary course of the defendants' business in respect to packages of a similar appearance. Upon a subsequent examination and experiment with chips saturated with the liquid which had leaked from the case, taken from the wharf and other places where said leakage had occurred, it was ascertained that the substance contained in the package was nitroglycerine, or glonoin oil. The said case contained some thirty gallons of nitro-glycerine, and the explosion of this substance occasioned the loss of life and injuries stated. Nitro-glycerine, when pure, is a nearly colorless substance, but when impure, it is nearly the color and consistency of sweet or salad oil. It is a liquid, and violently explosive. It is exploded by percussion and concussion, and by a high degree of pressure, but not by the mere contact with fire, either with flame or a burning coal. It will burn slowly without exploding by applying a flame to it, while the flame is in actual contact, but when the flame is withdrawn, it will cease to burn. Although it will burn while in contact with flame, yet it takes fire with difficulty, and is not, in the common sense of the term, "apt to take fire." It is not dangerous from the mere application of flame—as the flame of a candle—but in explosion, combustion takes place, and in that view it is combustible and dangerous. It will also explode upon being heated to a temperature of some 360 degrees Fahrenheit. It gradually decomposes when kept, and decomposition in a closed vessel disengages gases, the pressure alone of which may spontaneously explode it. Pressure, or the application of force, is the immediate cause of the explosion. In this instance, the nitro-glycerine, in one or more of the cans contained in the case in question, had, doubtless, become partially decomposed, generating gases, which occasioned pressure within the can, and a greater tendency to explode from external forces, and the percussion, or concussion, resulting from opening the box with the mallet and chisel, operating in connection with such internal pressure, must have produced the explosion. Its discovery was announced in 1847, by Sobrero, a chemist at Paris: in 1848 or 1849, Dr. Herring, of Philadelphia, made experiments with it to test its medicinal properties, and proposed for it the name of "Glonoine." Thereafter it was experimented with by various chemists, and its constituents and properties were mentioned in chemical treatises and scientific publications, and were taught as part of a college course of chemistry in some colleges as early as 1862; but prior to 1864, experiments upon nitro-glycerine were confined wholly to the laboratory of the chemist. It was only made in small quantities for scientific purposes. In 1864, it was proposed by Noble, in England, for blasting purposes. In June, 1865, he made some experiments in

blasting, demonstrated its extraordinary power, and introduced it to a limited extent in some of the European quarries and mines. He also published in England, in the summer of 1865, a pamphlet setting forth its qualities and advocating such use of it as possessing in volume about thirteen times and in weight eight times the explosive force of gunpowder. He patented it in England as Noble's patent blasting oil.

An account of the constituents, mode of preparing, and properties of nitro-glycerine was published on the eighteenth of November, 1865, in the Scientific American, a weekly periodical published in the city of New York, devoted to the expositions of subjects connected with science and the useful arts. In said article, Noble proposed to use it for blasting purposes, and his claims of its superiority therefor over gunpowder are set forth and commented on, directions for its use given, etc. In December, 1865, an accidental explosion of nitro-glycerine occurred at a hotel in the city of New York, which was mentioned in the newspapers of the day. The second steamer arriving from Panama, prior to the arrival of the steamer bringing the case in question, being some twenty days prior to the latter's arrival, brought a consignment of nitro-glycerine to Bandmann, Nielsen & Co., of San Francisco, which had been shipped to that house by Noble for sale, direct from Hamburg, by way of Panama. Letters of advice of said shipment had come to Bandmann, Nielsen & Co. by a previous steamer, and the firm had published circulars, stating the fact that they would have the new blasting agent for sale, and stating its properties, and had sent them to various newspapers, some of which had noticed it in their columns. Among these, at the solicitation of said firm, the San Francisco Mining and Scientific Press, a weekly publication issued in San Francisco, devoted especially to mining and scientific matters, in the numbers of the twenty-third and thirtieth of December, 1865, called attention to nitro-glycerine as a blasting agent, in two articles, illustrating with cuts the mode of using it, and containing testimonials of its extraordinary explosive force, and accounts of experiments with it, made the summer preceding, in mines and quarries on the continent of Europe. The said defendants subscribed for and received at their place of business, in San Francisco, together with a large number of other periodicals and publications, the said periodical, but they seldom read it, and did not read or notice the said articles on nitro-glycerine. Upon the arrival of said shipment by said steamers from Panama, Bandmann, Nielsen & Co. made some experiments in the vicinity of San Francisco in private, excepting in the presence of two or three persons, testing its properties, which proved successful; and they let the Central Pacific Railroad Company have some for trial, and had just received a favorable report from the engineer, which Mr. Bandmann was in the act of copying at the moment of the explosion in question at defendants' office.

Until the receipt of the advice of the said shipment from Noble, Bandmann had never heard of nitro-glycerine, glonoin oil, or Noble's patent blasting oil, and he did not know of the existence of such a substance. A second shipment of nitro-glycerine was made by Noble to Bandmann, Nielsen & Co. from Hamburg by the steamer European, which exploded, destroying the said steamship at Aspinwall, on the eighth day of April, 1866, eight days before the said explosion at defendant's express office; but the news of the explosion at Aspinwall had not reached San Francisco on the day of the explosion now in question. Although Noble made some efforts to bring his nitro-glycerine into notice in 1865, and had made these two shipments to Bandmann, Nielsen & Co. early in 1866, and the latter had taken the steps indicated, to bring it to the notice of the public in California, at the time the case in question was shipped at New York and received at San Francisco, nitro-glycerine was generally unknown to the public as an article of commerce, of practical utility, or otherwise, and was unknown to parties engaged in the business of transportation; and, at that time, there was no oil or liquid, of an explosive character like nitro-glycerine, known to commerce; and even among scientific men, the properties of nitro-glycerine were not so well understood as at present. The two explosions at Aspinwall and San Francisco, and the subsequent ones at Sydney and in England, called the attention of scientific men to the subject, and led to fuller investigations, and more precise knowledge of its properties. Neither the defendants, nor any of the employees of the defendants, nor of the Pacific Mail Steamship Company, who had anything to do with the package in question, nor the managing agent of the defendants on the Pacific coast, nor any of those killed by the explosion, knew the contents of the case in question, or had any means of such knowledge, or had any reason to suspect its dangerous character, nor did they know anything about nitro-glycerine, or glonoin oil, or that it was dangerous. The case had the appearance of other cases usually received in the ordinary course of defendants' business; was received and handled by the employees of the defendants in the same way that other cases of similar appearance were usually received and handled, and in the mode that men of prudence engaged in the same business would have handled packages having a similar appearance in the ordinary course of business, when ignorant of its contents, and with similar means of knowledge, as that possessed by defendants and their employees in the instance under consideration. There was no negligence on the part of the defendants in receiving said pack-

age, or in their failure to ascertain the dangerous character of the contents; or, in view of the condition of their knowledge, of the want of means of knowledge, and the absence of any reasonable ground of suspicion, no negligence in the handling of the said package at the time of the explosion. The defendants either repaired or paid for the repairs (to the amount of about six thousand dollars) of the premises occupied by themselves, except a portion of certain repairs made by plaintiff, which were necessarily made in connection with repairs made to those portions of the premises occupied by the other tenants of the plaintiff, and which defendants omitted to pay for by mistake.

The value of the repairs to the said premises occupied by defendants, and chargeable thereto, thus omitted to be paid by them, is one thousand seven hundred and eighty-seven dollars and sixty-two cents. The damages resulting from said explosion to the premises not occupied or held by defendants, but occupied by the other tenants of plaintiff named in the complaint, viz.: Bell and the Union Club, is twelve thousand eight hundred and fourteen dollars and sixteen cents. The portions of the injured premises occupied by the Union Club, at the time of the explosion, were so occupied under a verbal agreement with the plaintiff, to hold for two years, from the first of February, 1866, at a rent of five hundred and sixty dollars per month. The said lessees were "to keep the premises in ordinary repair—in decent, tenantable repair." This rent was paid up to the date of the explosion. After the explosion the Union Club refused to pay rent, on the ground that the premises were in an untenantable condition, and did not pay rent from the fifteenth day of April, till the first day of August—a period of three and one half months—and the rents for said period, according to the terms of the said verbal agreement, and which said Union Club did not pay, amount to nineteen hundred and sixty dollars. The premises during all of said period were in an untenantable condition, in consequence of said explosion, and said time was occupied in making the necessary repairs, and the said time was a reasonable time for making said repairs. The said several amounts found are values and damages respectively in gold coin.

J. P. Hoge and John T. Doyle, for plaintiff.
S. M. Wilson, for defendants.

SAWYER, Circuit Judge. As to the waste on the premises demised to the defendants, I adopt the views expressed by the district judge, in his opinion on the demurrer, and I need not repeat the reasoning here. [Case No. 10,773a.] Whether the waste complained of is technically permissive, or commissive, I think it falls within the provisions of the statute. And on the facts found, I think the defendants liable, although, as will hereafter

appear, there was, in my judgment, no negligence on their part. There was, doubtless, fault on the part of those who delivered the explosive substance to defendants for carriage over their express route, without informing them of the dangerous character of the article, for which they may be liable to defendants. The rule seems to be established, that, with respect to liability for waste, the tenant is in a position analogous to that of a common carrier, and without some special agreement to the contrary, responsible for all waste, however or by whom committed, except it be occasioned by act of God, the public enemy, or the act of the reversioner himself. 4 Kent, Comm. 77; Attersoll v. Stevens, 1 Taunt. 183; Cook v. Champlain Transp. Co., 1 Denio, 91; 2 Eden, Inj. 198, and notes. In White v. Wagner, 4 Har. & J. 373, this doctrine was carried out in an extreme case. The tenant is held responsible to the landlord, and left to his remedy over against the delinquent party. The liability does not depend on mere negligence, but it is imposed on the same grounds of public policy as those upon which the strict liabilities of common carriers are made to rest.

It is claimed in this case, that the covenant in the lease "at the expiration of the term. to quit and surrender the said demised premises * * * in as good condition as the reasonable use and wear thereof will permit, damages by the elements excepted," is a waiver of the tort; that it only binds the defendants to reasonable care, and protects them from liability for waste, resulting from accidents occurring without their fault. Also, that the covenant to "occupy the premises solely for the business of their calling, to wit: banking and express offices, and that they are not to underlet the same to any other person or persons, for any other business in part or the whole, without the prior consent in writing of the plaintiff," both entitles and requires the defendants to occupy the premises as an express office, and that by authorizing and requiring the defendants so to occupy, the plaintiff took upon himself all the risks incident to such business, not resulting from the wrongful act or negligence of the defendants; and that the accident in question is one of the risks so incident to the business, and for which defendants are not liable. After some hesitation, I conclude that neither of these positions is tenable; as to the first, one or two authorities seem to favor that view, but the weight of authority appears to be the other way. The authorities cited to sustain the latter proposition do not appear to me to be applicable to the facts of this case. If the defendants' counsel is correct in his position, I do not perceive why a tenant, who is to occupy the premises for a lawful purpose, in accordance with the terms of his lease, should be liable in any case for waste resulting from the wrongful act or negligence of a stranger, he himself being faultless. This would be totally inconsistent with the

rule as stated in the authorities already cited.

It is also insisted that no waste can be found where the land itself is not the subject of the demise, and that, as defendants were only tenants of the basement and first story, there could be no waste. It does not appear to me that the authorities cited go to that extent. There may be a freehold estate in apartments. 1 Greenl. Cruise, p. 49, § 21. The absolute destruction of the basement and first floor, demised to defendants, in the building described in the complaint, falls clearly within the defendants' own definition of waste, viz.: "Waste is a spoil and destruction of the estate, either in houses, woods or lands, by demolishing not the temporary profits only, but the very substance of the thing." Here is the destruction of the substance of a house, and even on land in the legal sense of the term, which embraces the building. The result is, that the defendants are liable for the waste on the premises demised to them.

As to the premises demised to other tenants, the question of liability depends upon entirely different principles. The action is not based upon the covenants in the lease to defendants, and it is, therefore, unnecessary to inquire whether there was a breach of the covenant in that lease, not to introduce into the premises demised to defendants, any articles "dangerous from their combustibility." I do not perceive that the relation of landlord and tenant, between the plaintiff and defendants, as to other premises than those injured, has any bearing unfavorable to the defendants upon the question of their liability. The defendants, in my judgment, stand in this kind of action in no worse position as to the premises occupied by Bell and the Union Club, than they would have been in, had the explosion taken place upon the premises of which they themselves were seized in fee, and destroyed the adjoining premises, leased by plaintiff to said Bell and the Union Club. What are the rights and responsibilities of the parties upon the facts, considered as strangers to each other, with respect to those premises? If the defendants are liable, it must be upon one of two grounds, either, firstly: that a party who introduces upon his own premises a highly dangerous substance, which, in consequence of such introduction, in some way injures his neighbor, is liable for the damages at all events, and under any and all circumstances, without regard to fault or negligence; or secondly: that the injury has been caused through the negligence and want of proper precaution and care in the party in introducing, or in managing such a substance after its introduction. Plaintiff's counsel insist that defendants are liable upon both grounds. In support of the first ground, the strongest case cited is Fletcher v. Rylands, L. R. 1 Exch. 265; and the same case in the house of lords on appeal, affirming the judgment of the court below (L. R. 3 H. L. 330). The defendant in that case constructed a reservoir to supply water for a mill situate upon his own prem-

ises, into which he diverted from their natural course the waters of a stream. In the construction of the reservoir, the engineer and workmen found five old shafts, which had been filled up with marl and clay. The shafts led down to certain passages, which had been excavated in working a coal mine, and which extended to, and connected with, the mine of the plaintiffs on their own premises, adjacent to those of defendant. The defendant was not aware of the existence of either the shafts or passages on his premises, but his workmen and engineer, in constructing the reservoir found the shafts, although they did not know with what they connected. The water from the reservoir broke through one of the shafts, ran through the passages into plaintiffs' mine, and produced the injury in question in the action. The court found, as a fact, that there was negligence on the part of the defendant's engineer and workmen in the construction of the reservoir; but the decision was not put on that ground. The defendant was held liable, and it must be admitted that the court stated broadly. that when a party brings an article upon his premises known to be dangerous, and liable to escape upon his neighbor's premises, and do injury, he is bound to see that it does not escape and do harm. The other cases cited, are cases where parties in blasting with gun, or blasting powder, upon their own premises, have thrown rock upon, and injured their neighbors, or their neighbors' premises, and cases of a similar character, as Hay v. Cohoes Co., 2 N. Y. 159. The observations of the judges in delivering their opinions, must be considered with reference to the facts of the cases decided. In all these cases, and the examples cited by the judges as illustrations of the principle adopted, the liability to escape and do injury, and the dangerous character of the article introduced, were necessarily known to the party introducing it. The properties of water and gunpowder are known to everybody. The liability of water collected in large bodies to escape through pressure, and of gunpowder to violently explode and do injury, are known to all persons of common sense in civilized communities, no matter how ignorant they may be in literary and scientific matters. It is a part of the common and general knowledge of the community, of which everybody is presumed to be possessed and of which, as such, the courts are bound to take judicial notice. Any party who introduces these things into his premises, does so with a full knowledge of their dangerous properties, and of their liability, even with the utmost care and precaution, to elude his vigilance, baffle his control, escape and injure his neighbor. It is worthy attention, that in the case of Fletcher v. Rylands, in the court of exchequer, two of the judges were of opinion that defendant was not liable, and judgment was entered in accordance with this view; but the judgment was reversed on appeal in the exchequer

chamber, and this last judgment affirmed in the house of lords. Blackburn, J., who delivers the opinion of the court in the exchequer chamber, does not fail to note knowledge on the part of defendant of the liability to escape and do mischief, as an important element to be considered on the question of liability. He says: "It seems but reasonable and just, that the neighbor, who has brought something on his property which was not naturally there, harmless to others so long as it is confined to his own property, but which he knows to be mischievous, if it gets on his neighbors', should be obliged to make good the damage which ensues, if he does not succeed in confining it to his own property." L. R. 1 Exch. 280. And his illustrations clearly show, that knowledge is an important element in the liability. For instance, he says, that a man is answerable for damage done by the escape of his beasts into his neighbor's field, for the grass they eat and trample on; for this is the natural consequence of their escape; but he is not liable "for any injury to the persons of others, for our ancestors have settled that it is not the general nature of horses to kick or bulls to gore: but if the owner knows that the beast has a vicious propensity to attack man, he will be answerable for that. Id. Again, "so in May v. Burdett [9 Q. B. 112], the court, after an elaborate examination of the old precedents and authorities, comes to the conclusion that, 'a person keeping a mischievous animal, with knowledge of its propensities, is bound to keep it secure at his peril.' And in 1 Hale, P. C. 430, Lord Hale states that when one keeps a beast, knowing its nature or habits are such that the natural consequence of his being loose is, that he will harm men, the owner 'must, at his peril, keep him up safe from doing hurt, for though he use his diligence to keep him up safe, if he escape and do harm. the owner is liable for damages.' * * * In these latter authorities, the point under consideration was damages to the person, and what was decided was, that when it was known that hurt to the person was the natural consequence of the animal being loose, the owner should be responsible in damages for such hurt, though when it was not known to be so, the owner was not responsible for such damages; but where the damage is like eating grass or other ordinary ingredients in damage feasant, the natural consequence of the escape, the rule as to keeping in the animal is the same." Id. 281. In affirming the judgment of the exchequer chamber, in the house of lords, the lord chancellor quoted the first passage above cited from the opinion of Blackburn, J., together with the context. and said, "In that opinion, I must say, I entirely concur." L. R. 3 H. L. 340. Thus, it is apparent from the language used and the illustrations cited, that knowledge of the dangerous character, or mischievous propensities of the thing or animal introduced on the part of the party introducing it, is an essential element in the cause of action. The "natural consequences" of the escape must be known, but the ordinary natural consequences of the escape of a tame beast, as the eating and trampling down of grain, grass, herbage, etc., the damage from flooding with water, filth, etc., are matters of universal knowledge, of which everybody is presumed to be cognizant, and of which everybody is bound to take notice. Since a party is bound to know those things, the law presumes that he does know them, and holds him responsible without special allegation or proof of knowledge. But all tame animals are not vicious—the goring of a man is not the ordinary consequence of an escape of a tame beast. When such a beast is vicious and liable to attack and gore people, or do other like kinds of mischief, it is an exception to the general rule, and all mankind are not presumed to know his vicious propensities; hence, in order to render his owner liable for such mischiefs done upon an escape, it is necessary to specially bring home to him knowledge of his vicious tendency. When this knowledge is brought home to him, he is presumed to know the ordinary consequences of the escape of such animal, and is liable for his vicious acts, as in other cases of knowledge. I know of no case, in which this doctrine has been held, unless knowledge of the propensities or character of the thing working the injury must be presumed by the law from its generally known character, or knowledge was specially brought home to the party dealing with it. Knowledge, therefore, in some form, must be an essential element in the cause of action. There is some reason for holding that a party who introduces into his premises a substance known to him, or which he is bound to know from the present universal knowledge of mankind, to be dangerous to his neighbor, shall do so at his own peril and be responsible for the consequences. He deals with the article with full knowledge of his peril, and knowingly assumes the risk. Should he suffer, it would be in consequence of his own folly, if not his fault. But why should a person innocently ignorant of the qualities of a dangerous thing unconsciously brought upon his premises in the pursuit of a lawful calling, not only be compelled to sustain the damage suffered himself, but, also, that suffered by his neighbor from an accident resulting therefrom without his fault. Upon what sound reason can such a doctrine be sustained? To carry the rule to that extent would be, to make every man an insurer of his neighbor against the consequences of all his acts, however faultless they may be. In my judgment, the law is not so rigorous and unreasonable.

But it is not clear, that even as to things universally known to be dangerous, the doctrine laid down can be sustained in the broad language sometimes used in discussing a given state of facts. Fire, for instance, is an element known to all men to be dan-

gerous, yet there are numerous cases where fires purposely set in a party's own grounds have spread to and damaged his neighbor's premises; as, for example, in clearing lands, in which the party setting the fire has been held not to be liable, unless there was negligence. So in the case of water, it was held that when one builds on his own land a mill-dam, on a proper model, and the work is faithfully done, he is not liable to an action though it breaks, and his neighbor's dam and mill are thereby destroyed. Livingstone v. Adams, 8 Cow. 175. To the same effect are Hoffman v. Tuolumne Water Co., 10 Cal. 413, and Campbell v. Bear River & A. Water Co., 35 Cal. 6·3. These were not cases that could be referred to vis major. I can perceive no good ground for distinction as to the question of liability, between thus accumulating upon one's land water in a natural stream largely beyond the natural quantity, and introducing it from abroad. See, also, as to bursting of water pipes, Blyth v. Birmingham Water Works, 11 Exch. 781. These are but examples of a very large number of cases of like character. Why were not the defendants in these instances responsible for all damages resulting to their neighbors, if a party introducing or dealing with a dangerous article, thing or element upon his own premises is liable at all events, and under all circumstances, without reference to negligence, or any fault on his part? And in these cases the parties had knowledge of the dangerous character of the matters with which they were dealing. If I am right in the views thus far suggested, the first proposition upon which the liability of defendants for the injuries to the premises occupied by Bell and the Union Club is rested, is untenable.

There must then have been knowledge, on the part of defendants, of the dangerous character of the explosive substance introduced upon the premises occupied by them, or there must have been what the law deems negligence on their part, or there is no liability. Upon the question of knowledge, I am satisfied from the evidence, and I so find the facts to be, that nitro-glycerine, at the time of the explosion in question, had not become so generally known to the world, commercial or otherwise, as to be a part of the ordinary knowledge of the people, even in intelligent communities. It had hardly yet emerged from the domain of strictly scientific research. It is true, that, at the time, it had recently, to a very limited extent, been introduced to the knowledge of miners and others in Europe; but only to a limited extent. At the very time, efforts were being made by a single person to introduce it into this country for blasting purposes. A short time (but a few weeks) before, an effort had been made—and the first effort of the kind—by one house, to whom a consignment had been made, to bring it into notice in this state; but it does not appear that it had

been introduced into public use in other parts of the United States. This knowledge of the article, both of its name and its properties, was confined, comparatively speaking, to a very few. Of course, it is impossible to ascertain, even approximately, the exact extent to which it had become known; but from the general tenor of the evidence, I think it might be safely assumed that not one in a thousand in the United States, or California, would have known anything about the substance or its properties, had it been mentioned by its common name, glonoin oil, or nitro-glycerine. However that may be, it is very evident, that it was known outside of the laboratory of the chemist to a very limited extent, and not sufficiently to be recognized as a part of the common knowledge of the country, even in intelligent circles. It was new—I might say, almost entirely unknown—to commerce. It had not obtained such notoriety that ordinary people, or commercial men, can be presumed to be cognizant of its properties. As an illustration of the state of knowledge, even among scientific men and chemists, of several professors of that science in our colleges and university, examined as experts on behalf of the respective parties, not one had heard of nitro-glycerine, as an article of commerce, or of practical utility, or outside the domain of science, prior to the explosion in question in 1866. One professor, who appeared to be well informed in his profession, and as to the article in question, could not say that it had before that time been brought to his attention, even as a matter of scientific interest. Another, who had formerly been a professor of chemistry in the Normal College, in Swansea, Wales, and who has for several years been, and now is the analytical chemist of the San Francisco refining and assaying office, and professor of chemistry in the Toland Medical College, also in the City College, was so little familiar with nitro-glycerine and its properties, that after the explosion, when some of the chips, saturated with the substance which leaked from the case on the wharf, were taken to him for analysis, he did not know what it was. Even after he had proceeded some time with the analysis, applying various tests, and after an accidental explosion had taken place in the course of the process of the analysis, the name of the article did not suggest itself to him till he had consulted his toxicological works, and found that a substance apparently having the same properties, was called nitro-glycerine; yet, he had years before experimented with it in the laboratory as a matter of scientific interest, but the fact had passed from his recollection. In point of fact, attention appears from the evidence to have been but little directed towards the substance, even in the scientific world at large, until called to it by the explosion in question, the one at Aspinwall about the same time, and one or two

others occurring at a later date. Since then it has been the subject of extensive experiments, which have brought to light much of the present prevailing particular knowledge with reference to its properties. With so little general knowledge of the substance, at the time of the accident, outside the laboratory, even among chemists and scientific men, who usually take a special interest in such substances, and who are more likely to notice the progress of their introduction into the practical affairs of life, it could scarcely be expected that the public generally engaged in the ordinary pursuits of agriculture, manufactures and commerce, would be informed upon the subject; and, I am satisfied from the evidence, that the substance and its properties were, at the time of the shipment and explosion, almost wholly unknown to the public and to commerce; and further, that while the state of public knowledge was not such that the defendants were bound, or could be presumed in law, to know the existence or properties of the substance, I am also satisfied that they did not in fact, nor did any of their employees engaged in handling the case in question, have any knowledge on the subject; that the package was received and handled by the defendants and all in their employ, up to the time of the explosion, in utter ignorance of its contents, or the dangerous properties of the substance itself, had the contents been known, and that they had no ground to suspect its dangerous character—nothing to put them upon inquiry, as prudent men, as to what it was. I do not perceive that the fact of the arrival of the case on the sailing day of the steamer, and after its departure, or that it was not strapped or marked, as required by the regulations of the defendants, has anything in it to suggest to an ordinarily prudent man, engaged in the business of a common carrier, that the case contained anything dangerous. It was, at most, simply indicative that the party presenting it was not acquainted with the requirements of the company, which was, doubtless, no uncommon thing with those who were not in the habit of making frequent shipments. When the defendants' servant was requested to strap the case, he obtained a wooden hoop from a pile kept for the purpose, and the proper implements at hand, and strapped it, driving nails into the box with as much unconcern, as if it had been a case of boots and shoes. He evidently had no suspicion that it was liable to explode from the effects of his blows, or that it was in any respect dangerous; and the fact that hoops and implements were kept at hand for such purposes, indicates that this want of conformity to the regulations of the defendants was by no means singular—that such exigencies were anticipated, and provided for. The box appeared in all other respects in good condition and suitable for shipment—as much so as the thousands of others of a similar apparent character shipped by the same steamer. There was, then, in fact, no knowledge, and nothing that should necessarily excite the suspicions of a prudent man engaged in that business, and constantly receiving for carriage boxes of merchandise of similar appearance. Indeed, I think it would have been very remarkable, if one receiving and handling so many similar cases, upon the facts disclosed by the evidence, had suspected that it contained anything of a dangerous character.

It is insisted, further, by the plaintiff's counsel, that it was the duty of the defendants to acquaint themselves with the character of the merchandise delivered to them to be carried, and being bound to do so, they are chargeable with knowledge in fact; or that, at least, a failure to acquaint themselves with the character of the article to be carried is, of itself, such negligence as will render them liable. In my judgment, neither proposition is tenable. The numerous authorities cited to sustain these propositions, are cases where parties had sent valuable packages, or valuable articles in trunks as baggage, or frail goods requiring great care in handling, and cases of a similar character, and the party sending had either neglected, or upon request declined to inform the carrier of the character or value of the articles contained in such packages or trunks. The questions arose between the party sending and the carrier, in actions to recover for the loss or damage sustained in carrying. In none of these cases, which have fallen under my notice, has it been held that the carrier had an absolute right to know the contents of packages or baggage thus sent; but the consequence imposed on a failure of the owner to give the information when requested, or upon giving false information, is, that he shall not recover the extraordinary value of the articles lost, or for damage to articles requiring extraordinary care to prevent breakage or injury. I know of no case, in which it has been held, that a carrier has an absolute right to know the contents of a package tendered to him to be carried, or that imposes upon him a duty to make inquiry as to the contents of every package, without regard to circumstances exciting suspicion. In fact, the practice is usually otherwise, and bills of lading given to shippers by common carriers, often, if not usually, contain the clause, "contents unknown." Abb. Shipp. 339. The ordinary bill of lading of the Pacific Mail Steamship Company, which brought the case in question for defendants (a copy of which was introduced in evidence), contains the clause, "contents unknown." If the inquiry were made, there is no certainty that the contents of a package would be correctly given. In all probability, the servant delivering packages seldom knows the contents himself. The only way to obtain evidence would be to open the package, and examine it. The carrier,

certainly, would have no right to open every package tendered for carriage. And I apprehend a carrier would have no right to decline a package, on the ground that the owner refused to disclose the contents, unless there was some ground to suspect that it contained something dangerous, hurtful, offensive, or otherwise of a character not proper to be carried. In Crouch v. London & N. W. R. Co., 14 C. B. 255, which was an action for refusal to carry certain goods, the fifty-seventh plea to the first ten counts expressly set up as a defense, that defendant requested the plaintiff to inform it of the contents of the package tendered to be carried; that the plaintiff refused to give the information, and that defendant refused to carry it on that ground. Id. 260. The court held the plea bad. Jervis, C. J., said: "I am of opinion that the fifty-seventh plea is a bad plea. No authority has been cited to show that a carrier is in all cases entitled to know the nature of the goods contained in the packages which are tendered him to be carried; and there seems to be no good reason why he should be. * * * This plea founds itself upon the broad and general proposition, that whatever be the nature or quality of a package delivered to a carrier, he is not bound to receive it, unless informed of the description of its contents. That proposition involves consequences so highly inconvenient as, in my judgment, to require authority to sustain it. None has been shown." Id. 291, 292. And Maule, J., says: "To say that the company may in all cases insist upon being informed of the nature and contents of every package tendered to them, as a condition of their accepting it, seems to me to be a proposition perfectly untenable." Id. 295. Creswell and Williams, JJ., express individually the same views. Id. 297. If the owner is not bound to state the contents of a package under all circumstances, it follows that the carrier is not bound to ask the contents under all circumstances. He is only bound to make inquiries, when he is entitled to have them answered, or when he has ground to suspect that there is something wrong about the goods tendered for carriage. Says Lord Campbell, C. J., in Brass v. Maitland, 6 El. & Bl. 482: "It would be strange to suppose that a master, or mate, having no reason to suspect that goods offered to him for a general ship may not be safely stowed away in the hold, must ask every shipper the contents of every package." If the carrier has reason to believe that the package contains anything dangerous, or not proper to be carried, he, doubtless, may refuse to carry it, unless the contents are disclosed, or he is satisfied as to its character. He may, in England, for a statute upon the subject expressly authorizes him to do so; but if he refuses to carry on that ground, he must allege and prove the reasonable ground, or he will fail in his defense. 14 C. B. 291, 292. It is, however,

the duty of the shipper, at least, if he himself has knowledge, to give notice of the dangerous character of any package delivered to a carrier, where the party receiving it may not, upon inspection, be reasonably presumed to know its character. There is an implied undertaking that they are not dangerous. Brass v. Maitland, 6 El. & Bl. 470; Farrant v. Barnes, 11 C. B. (N. S.) 561; Shear. & R. Neg. § 593; Pierce v. Winsor [Case No. 11,150]. But even in that class of cases, where the action is between the shipowner and the shipper, growing out of the contract of carriage. Compton, J., said, in Brass v. Maitland, 6 El. & Bl. 488, the count under consideration, "clearly falls within the principle of the case of Williams v. East India Co., 3 East, 192. In that case Lord Ellenborough remarks, in giving the judgment of the court, on page 200: 'In order to make the putting on board wrongful, the defendants must be cognizant of the dangerous qualities of the article put on board;'" and [6 El. & Bl.] 492: "It seems very difficult to hold that the shipper can be liable for not communicating what he does not know." After suggesting some illustrations, he says: "Again suppose that there is a new article of commerce, which neither shippers nor shipowners know to be dangerous; is the innocent shipper to be liable? Lord Ellenborough's dictum in Williams v. East India Co., 3 East, 192, above referred to, would tend to show that knowledge of the party shipping is an essential ingredient." 6 El. & Bl. 491, 492. And these views seems to be approved by the court in Hutchinson v. Guion, 5 C. B. (N. S.) 163. Perhaps this is the true legal principle as between the shipper and carrier, when the shipper has no means of knowledge or ground for suspicion, as well as none in fact; but, otherwise the doctrine, I think, can hardly be maintained in the broad terms in which it is stated by the learned judge. But in either view, the reasoning applies with much greater force, as between the carrier who receives the package without knowledge, or possible means of knowledge, or reason to suspect its dangerous character, in the due and ordinary course of his business to carry for another, and a stranger who happens to be injured by it through a faultless accident occurring in the ordinary course of transit. Whatever the true rule may be as between the shipper and carrier, it seems reasonable that there should be no liability as between the carrier and the stranger, when both are equally innocent. As between carriers and strangers, between whom no privity exists, the carrier cannot be held to the same rigid rules of responsibility as those which apply to dealings between the shipper and carrier. While a man is so bound to use his own as not to injure his neighbor, this maxim does not make him an insurer of his neighbor's property against all accidents that may happen through his

acts, but only requires of him reasonable care and precaution. I might as well here refer to Pierce v. Winsor, supra, cited by plaintiff's counsel as a strong case in their favor. That was a case between the shipowner and a party who had chartered a ship for the voyage, and then put her up as a general ship. The ship was at the sole use and disposal of the charterer, and it was stipulated that their own stevedores should be employed by the owner. Some mastic put on board in casks escaped, ran together among other goods and hardened, damaging said goods. The owner, having paid to the owners the damages to the other goods, sued the charterer. This case, however, does not appear to be inconsistent with the views of Compton, J., in Brass v. Maitland, with the limitations before suggested in this opinion. Neither the owner nor shipper had actual knowledge of the liability of the mastic to do injury. Both being equally ignorant in fact, the liability was put upon the ground, that, although the shipowners and their employees had no reasonable means during the lading to ascertain the quality of the goods, or narrowly examine the sufficiency of the packing, the shippers had such means; and that it seems expedient, that although in fact ignorant, the loss should fall on them rather than on the owners—on the party having the means of knowledge, rather than on the one who had them not. The case does not appear to me to be against the defendants in the case in hand. On the contrary, it recognizes the principle adopted in this opinion: that the carrier, in receiving goods for transportation, independent of any suspicious circumstances, has no means of knowledge of the contents and character of packages delivered to him for carriage. I think, therefore, that the defendants, without any ground of suspicion, as to the character of the contents of the case in question, had no means of knowing their dangerous qualities, and were not, as to the plaintiff—a stranger to the contract for carriage—bound in law at their peril to know their character. That they did not in fact know, and that they had no reason to suspect the dangerous character of the package, I am satisfied from the evidence, and so find the facts in the case to be.

For similar reasons, there was no negligence under the circumstances, in not inquiring as to the contents of the package. The defendants were acting in the ordinary course of their business. It was a culpable violation of duty on the part of the owner to deliver a dangerous article exhibiting no external indications of its real character, without informing them as to the danger. In the exercise of his lawful rights, every man has a right to act on the hypothesis that every other person will perform his duty and obey the law; and in the absence of any reasonable ground to think otherwise, it is not negligence to assume that he is not exposed to a danger, which can only come to him through a disregard of law on the part of some other person. Jetter v. New York & H. R. Co., 2 Keyes [*41 N. Y.] 154; Earhart v. Youngblood, 27 Pa. St. 332; Deyo v. New York Cent. R. Co., 34 N. Y. 10, 11; Curtis v. Mills, 5 Car. & P. 489.

At this time there were regularly carried to California, by defendants, by each steamer, besides those carried to Panama, Central and South American ports, from four thousand to six thousand packages of a similar general external appearance. It would be unreasonable in the extreme, to expect them to know, or make inquiries as to the contents of each package. It is not the habit of ordinarily prudent men engaged in the business of common carriers to do so. No reasonable man would take such extraordinary precautions, and the law imposes upon carriers no such extreme degree of care. In Shearman & Redfield on Negligence (section 6), the rule of law is well stated, as follows: "The law makes no unreasonable demands. It does not require from any man, superhuman wisdom or foresight. Therefore no one is guilty of culpable negligence, by reason of failing to take precautions which no other man would take under the like circumstances. If one uses every precaution which the present state of science affords, and which a reasonable man would use under the circumstances, he is not held responsible for omitting other precautions which are conceivable, even though, if he had used them, the injury would certainly have been avoided." "In determining what is negligence, regard is to be had to the growth of science, and the improvement in the arts which takes place from generation to generation; and many acts or omissions are now evidence of gross carelessness, which a few years ago would not have been culpable at all; as many acts are now consistent with great care and skill, which in a few years will be considered the height of imprudence." Id. § 7. Having, then, no absolute right to know the contents of packages delivered for carriage, and there being no reasonable ground, to believe, that the case in question contained anything dangerous; and it not being the practice of ordinarily prudent men engaged in the business of carriers to ascertain the character of all goods carried; and having a right to rely upon the presumption that no breach of duty would be committed by the shipper, by delivering a highly dangerous package without giving notice of its character; there was no negligence on the part of the defendants in omitting to ascertain the contents of the case in question.

And for similar reasons, there was no culpable negligence on the part of defendants in opening the case with a mallet and chisel, in the mode pursued in this instance, for the purpose of ascertaining the extent of the damages. This was the ordinary mode of opening boxes of an apparently like charac-

ter. It was opened in the presence of a representative of both the steamship company and the express company,' in the regular course of business, when it is found that a package has been damaged in order to ascertain both the extent and character of the damage, and which party is responsible. The parties engaged were wholly ignorant of the character of the substance with which they were dealing. At that time there was no oil known to commerce, or commonly known to be an article of practical utility, or known to defendants or their employees, which would explode by percussion or concussion. The oil which leaked out had the general appearance of sweet or salad oil, which as also any other oil known to commerce, would have been perfectly innoxious under similar treatment. The box was manipulated in the presence of Mr. Knight, second in authority in the management of defendants' business on the Pacific coast, and of two others of the principal clerks of the two companies, and other employees, acting under their direction. They, as well as those who received the package in New York, who unloaded the package from the ship, those who tumbled it about on the wharf, and carted it to the premises in question on a dray, acted in all respects as men ordinarily would act, who are unconscious of danger, and as no man of common sense having reason to apprehend danger would have acted. They forfeited their own lives as the penalty of their faultless ignorance. Yet they acted as any other men of ordinary prudence, or even of extreme prudence, with the same knowledge, or means of knowledge, or want of reason to apprehend danger, would have acted— as any man of prudence would have acted under the same circumstances. It would not have been negligent to have opened the case of silverware, having a somewhat similar appearance, which was also saturated with oil, as the result shows, from the leaking case, and which was sent up with the latter for a similar examination, or, so far as is known, any of the other four or five thousand packages received by the same steamer. Yet there was no more ground for believing this package to be dangerous than any of the others. That it was not legal negligence to thus handle the package, under the circumstances, is recognized by the case of Pierce v. Winsor [supra], already noticed, cited by plaintiff. Says Mr. Justice Clifford: "The stowage of the mate was made in the usual way; and it is not disputed it would have been proper, if the article had been what it was supposed to be when it was received and ladened on board. Want of greater care in that behalf is not a fault, because the master had no knowledge, or means of knowledge, that the article required any extra care or attention beyond what is usual in respect to other goods."

These observations precisely fit the circumstances under consideration.

This being the case, there was, in my judgment, no negligence under the circumstances —nothing that the law deems negligence, and there was no liability to strangers for the consequences of the unfortunate accident. If defendants are liable under the circumstances, I do not perceive why they would not have been liable if they had made careful inquiry, and had been solemnly assured that the case contained olive or sweet oil, or some other harmless merchandise, and had relied on that assurance. To hold them liable upon the case supposed would be unreasonable and abhorrent to all ideas of justice. I think that, while the defendants will be obliged to bear the loss sustained by themselves, resulting from the deplorable accident, except so far as they may have a remedy against the guilty shipper, the plaintiff, also, will be compelled to submit to the loss sustained by him from the same lamentable cause. It is one of those misfortunes which are liable to occur in human affairs, wherein those upon whom the consequences chance to fall, must be the ones to suffer, unless they can find a remedy against those who are really culpable.

The plaintiff also insists, firstly: that the accident is of a class where the event itself makes out a prima facie case of negligence, and throws the burden of proving due care and circumspection on the defendants; and secondly: that every man is presumed to do his duty and conform to the law; that under this rule it must be presumed that the shipper in this instance performed his duty, and informed defendants of the dangerous character of the article, and that, although it required the proof of a negative, the burden of showing want of knowledge was thrown upon them.

I am not prepared to admit the correctness of, at least, the first proposition, whatever may be the rule as to the second. But under the view I take of the evidence, it is wholly unnecessary to controvert either position; for, conceding them to be correct; in my judgment the evidence on both points clearly overthrows the assumed presumption in favor of the plaintiff, and shows that there was no negligence on the part of defendants, or their servants, and that the dangerous character of the package was not communicated to them, and that there was nothing to excite even the suspicion of a reasonable man. The package was received when accepted by the freight-measurer, O'Leary, and the tally clerk, Middlebrook, in the mode stated in the findings, and from that time it went into the great mass of freight, and no further special notice was taken of it. The receipt given by Middlebrook, although but a temporary receipt, was the original receipt, from which all subsequent ones were made up. The general receipt, way bill, and bill of lading clerks made out their papers from this, without seeing or inspecting, or having any opportunity to in-

spect the merchandise. This receipt was their only guide. And proof of all that took place at the time of the delivery was given.

It is sometimes necessary to prove a negative, although from the nature of things, this is usually difficult, and for this reason, plenary proof of a negative is not always expected or required. 1 Greenl. Ev. § 78; Kohler v. Wells, Fargo & Co., 26 Cal. 611, 612. But in this case, the proof on those points is, to my mind, full and entirely satisfactory.

Fully impressed with the importance of this case, both in view of the large amount of damages claimed and of the important principle involved applicable to many other actions, which, I am informed, are pending in this state and elsewhere, arising out of the same and other similar accidents, I have given to it such thought and attention as my other onerous duties have allowed me to bestow; and the conclusion to which my mind is brought, is, that the defendants are liable for the injuries to the premises demised to and occupied by themselves, but are not liable for the injuries resulting to the premises occupied by Bell and the Union Club. This is the first case decided, so far as I am informed, arising out of these accidents, involving the points now determined. And no case involving the exact point has been brought to my attention. Should it turn out that my conclusion is wrong, I am glad to know that there is a tribunal which can, and will, correct my error. I have taken care to frame the findings in such a way that, if I have erred in my legal conclusions, on either branch of the case, the appellate court will have the means of correcting the error by directing the proper judgment upon the facts found, without ordering a new trial.

As to the premises occupied by Wells, Fargo & Co., the statute provides that, in an action for waste, "there may be judgment for triple damages." Prac. Act, § 250. As I understand this provision, it leaves the question as to whether the damage shall be tripled to the sound discretion of the court, to be determined according to the greater or less aggravating character of the circumstances. There are no circumstances in this case to justify inflicting damages beyond the actual amount sustained. In point of fact, the defendants repaired a large portion of the premises to the satisfaction of the plaintiff, and paid the expenses themselves, and supposed they had done so as to the whole; but it turns out in the evidence that a small portion of the expense of repairs, which, from the nature of the case, could not well be made except in connection with repairs made to other premises which defendants, according to the view taken, are not liable to repair, have been overlooked, and accordingly not been paid. For this amount the plaintiff must have judgment.

Let judgment be entered for the plaintiff for the sum of one thousand seven hundred and eighty-seven dollars and sixty-two cents,

and interest at ten per cent. per annum, from August 1st, 1866, in gold coin, and costs of suit.

Judgment accordingly.

[The case was taken upon writ of error sued out by the plaintiff to the supreme court, where the judgment of this court was affirmed. 15 Wall. (82 U. S.) 524.]